THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CECIL DARNELL *et al.*, Defendants-Appellants.

First District (1st Division)   Nos. 1—87—2681, 1—87—2682 cons.

Opinion filed December 24, 1990.—Rehearing denied June 20, 1991.

Randolph N. Stone, Public Defender, of Chicago (Joseph M. Gump and Vicki Rogers, Assistant Public Defenders, of counsel), for appellant Cecil Darnell.

Michael J. Pelletier and Leslie Wallin, both of State Appellate Defender's Office, of Chicago, for appellants Frances Velez and Joseph Swiatkowski.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Gunta A. Hadac, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

This is a consolidated appeal. Following a joint bench trial, defendants, Cecil Darnell, Frances Velez and Joseph Swiatkowski, were each convicted of delivery of a controlled substance (Ill. Rev. Stat. 1983, ch. 56½, par. 1401(a)(2)) and sentenced to six years' imprisonment. On appeal, Darnell contends that he was entrapped by a police informant into committing the offense. Velez and Swiatkowski contend that: (1) they were denied their right to a fair trial by the admission of the undercover agent's unreliable hearsay testimony regarding a statement allegedly made by Darnell during the drug deal that implicated Velez and Swiatkowski; and (2) they were not proven guilty of delivery of a controlled substance beyond a reasonable doubt. For the following reasons, the judgment of the trial court is affirmed as to Darnell and reversed as to Velez and Swiatkowski.

The facts underlying the convictions are as follows. At trial, Chicago police detective Thomas Keough testified that on July 16, 1985, Bud Armstrong, a police informant, introduced him to defendant Cecil Darnell at a Chicago tavern. Keough was operating as an undercover agent for the narcotics division at the time. The three men had a drink, and then Keough and Darnell walked out to Darnell's car and got in. In the car, Darnell produced a plastic bag of cocaine and told Keough that the price was $600. After Keough purchased the cocaine, Darnell asked him if he had any connections from whom he could get codeine-based cough syrup. Keough said he would look into it. The men went back into the bar and exchanged telephone numbers. At no point did Darnell tell Keough that Armstrong was forcing him to sell cocaine or that Armstrong had threatened his life.

Six days later, on July 22, Keough received a message on his pager to call Darnell. When Keough returned the call, Darnell asked

if Keough had gotten a price on the cough syrup. Keough told Darnell that he was going out of town for two weeks, but that he had talked to a source. Darnell told Keough that if the price was right, he would be able to take 20 gallons. Darnell then asked if Keough would need any cocaine. When Keough said he could use an ounce when he got back into town, Darnell told him to call on July 31 and he would have it ready.

Subsequently, on July 31, 1985, Keough and Darnell arranged by telephone to meet later that night at a bowling alley. During the call, Darnell asked Keough how much cocaine he would need that day. When Keough said he would need one ounce, Darnell replied that the price would be $2,100, but lowered it to $2,000 when Keough balked at the price. Later that night, when Keough arrived at the bowling alley, he walked up to Darnell and they both walked toward the bar. As they were heading toward the bar, Darnell handed Keough a manila envelope and said, "Take this." Keough put the envelope into his pocket and the two sat at the end of the bar. Once seated, Keough opened the envelope, saw it contained white powder and paid Darnell $2,000. Darnell put the money into his pocket and asked again about the cough syrup and also asked Keough to check on obtaining some other codeine-based expectorants, some Doraden, and other controlled substances, the names of which Darnell wrote down on a piece of paper.

On August 5, 1985, Keough had another telephone conversation with Darnell during which Keough ordered another two ounces of cocaine. They agreed on a price of $3,700 and were to meet at a local tavern the next night. On August 6, approximately 8 p.m., Darnell arrived at the tavern. Keough and Darnell discussed codeine-based syrup and Darnell asked if Keough had gotten a price. When Keough said that the price was $300/gallon, Darnell replied that the price should not be more than $225. Darnell then offered to trade 10 ounces of cocaine for 40 gallons of codeine-based cough syrup plus $7,900 in cash. Keough told Darnell he would have to talk to his source.

The two men then went out to Darnell's car to get the cocaine. As they approached the car, Keough saw a female sitting in the passenger seat. As they got closer, she got out of the car and started to walk away. When Keough and Darnell got into the car, Darnell reached under the driver's seat, grabbed a clear plastic bag of white powder and handed it to Keough. Keough examined the powder, weighed it on a portable scale and paid Darnell $3,700. Darnell then told Keough to contact him as soon as he heard about a source for the

codeine-based syrup. Keough testified that the area was under surveillance throughout the transaction.

On August 7, 1985, approximately 9:30 p.m., Keough and Darnell arranged by telephone to meet the following evening so that Darnell could examine a sample of Bromanyl expectorant that Keough had acquired. The next night, approximately 7:45 p.m., Darnell and Keough met in Lincoln Park. Keough showed Darnell the gallon of Bromanyl expectorant he had. Darnell pulled a label out of his pocket and compared it to the label on the bottle Keough had brought. When he was sure that the contents were the same, Darnell ordered 40 gallons and reiterated that he would trade 10 ounces of cocaine for the syrup and $7,900 in cash. They planned to complete the deal the next day. Before leaving, Darnell gave Keough two more cough syrup labels and asked Keough to check with his source on their availability.

The following day, August 9, 1985, approximately 1 p.m., Keough, with surveillance units, went to the Ford City Shopping Center parking lot to meet Darnell. Approximately 1:40 p.m., Keough received a pager message from Darnell. When Keough telephoned Darnell, Darnell told him that he was running late because his cocaine source had just arrived. He asked Keough to wait for him. Finally, approximately 3:30 p.m., Darnell arrived and got into Keough's car. When Darnell asked to see the 40 gallons of codeine-based syrup, Keough asked to see the cocaine. Darnell replied that he had two people with him and that the other guy did not want the cocaine and the money in the car at the same time. Keough gave Darnell the cash, but said he would have to see the cocaine first before he gave him the syrup.

Darnell then got out of Keough's car, got into his own and drove out of sight. Approximately five minutes later, Darnell returned and Keough got into Darnell's car. Darnell said he had it and pointed to a white shopping bag lying open on the front seat. Inside the bag were two large clear plastic bags with rock and powder and one small bag. Darnell told Keough the small bag of cocaine was a bonus for setting up the deal.

When Darnell asked Keough for the syrup, Keough told him that he had four gallons in his trunk and the other 36 gallons were in a van parked about 100 feet away. Keough then got the four gallons out of his trunk, put them in Darnell's trunk, got into Darnell's car and told him to pull his car up next to the van. When they reached the van, Keough got out and handed the cocaine to the undercover agent driving the van. The arrest signal was given and the surveillance units began to converge on Darnell's car. Darnell ducked down into

his seat and started to speed away. However, he was blocked by several surveillance units before he got out of the parking lot.

Following Keough's testimony, Officer Phillip Pariso, a Chicago police officer who had worked surveillance detail at Darnell's residence, testified that on August 9, 1985, approximately 1:40 p.m., he saw Swiatkowski arrive at Darnell's house in a blue Chevette and enter Darnell's house. He did not see Swiatkowski carry anything from his car into the house. Approximately one hour later, Swiatkowski left Darnell's house with Velez and Darnell. He did not see any of the defendants carrying anything. Swiatkowski drove off in his own car and Velez and Darnell walked through the gangway toward Darnell's garage and left in Darnell's car. Pariso followed the cars as they took the Kennedy Expressway to the Stevenson Expressway and exited at Pulaski. In the vicinity of 55th and Pulaski, both cars pulled over and Velez got out of Darnell's car and into Swiatkowski's car. Pariso did not see Velez carry anything from one car to the other. Both cars then proceeded southbound to the Ford City Shopping Center parking lot.

Michael Cummings, Chicago police officer, also testified that on August 9, 1985, he was working surveillance and followed two vehicles from Darnell's house to the Ford City Shopping Center. At the shopping center, he saw Swiatkowski, with Velez as a passenger, park his blue Chevette near the main drive-thru. Darnell then drove his car over to Keough's car. After a few minutes, Darnell drove his car toward Swiatkowski's car and parked perpendicular in front of it. The passenger door on Swiatkowski's car opened and Velez got out, entered Darnell's car, spoke to him for a few minutes, walked back to Swiatkowski's car, took a white bag from the front seat and handed it to Darnell. Darnell then drove back to Keough's car and parked next to it. At that point, Swiatkowski drove his car a little closer to Darnell's. Keough then took a box out of his car and put it in Darnell's car, after which Darnell drove both himself and Keough to where the van was parked. Keough exited Darnell's car, walked up to the van, and handed the white bag to the officer in the van. The surveillance units then moved in to make the arrest.

Next, John Wheaton, Chicago police officer, testified that on August 9, 1985, in the early afternoon, he arrested Darnell at the Ford City Shopping Center while Darnell was attempting to flee in his vehicle. When Wheaton searched Darnell's car, he found $7,900 in United States currency and a carton containing four gallons of Bromanyl expectorant. Wheaton then showed Darnell a search warrant to search his house. Darnell told Wheaton that he had some guns and

Demerol in the garage rafters. When Wheaton searched the garage, he found two handguns, a couple of scales, a large bottle of lactose and two smaller bottles of Demerol. Following Wheaton's testimony, the State rested its case. The attorneys for the three defendants each moved for a directed finding, which the trial court denied.

On his own behalf, Darnell testified that in the early afternoon of July 16, 1985, he was at a local tavern talking to Bud Armstrong, whom he had known casually for approximately five years, when Armstrong told Darnell that he was in trouble with his cocaine dealer and wanted Darnell to take care of some deals until Armstrong got back into the dealer's good graces. Although Darnell thought that Armstrong was a "rough character" and knew that Armstrong had once been convicted of a triple homicide, Darnell initially told Armstrong that he would not help him. However, when Armstrong threatened to tell Darnell's wife that Darnell and Velez had been having an affair, Darnell agreed to deal some cocaine.

Consequently, later that day, in the tavern, Armstrong introduced Darnell to Keough. Darnell and Keough then went out to the parking lot where Darnell sold Keough some cocaine at a price allegedly set by Armstrong. Darnell claimed that he never kept any of the money that he received from the various cocaine deals with Keough. Instead, he gave all of it to Armstrong. Darnell admitted, however, that he had discussed obtaining cough syrup from Keough on two occasions.

Darnell further testified that in late July, Keough telephoned him to order an ounce of cocaine. Darnell got the cocaine from Alfredo, allegedly one of Armstrong's sources, and met Keough at a bowling alley on July 31, 1985, to consummate the deal.

Thereafter, on August 6, 1985, approximately 7:30 p.m., Darnell met Keough at another tavern and sold him two ounces of cocaine for $3,700. Darnell had arrived at the tavern with his stepdaughter in the car, but told her to leave for a few minutes while he spoke to Keough. That night, Keough asked Darnell if he could make an exchange of the cough syrup and cash for 10 ounces of cocaine. Darnell claimed that he agreed to the deal because he knew the Bromanyl cough syrup he had requested was not being made anymore and that it would be impossible for Keough to obtain 40 gallons of it. He figured this would be a way for him to terminate the drug-dealing relationship.

The following day, Keough called Darnell and told him that he had a sample of the syrup for Darnell to examine. They met that night, and Keough showed Darnell the cough syrup. Darnell testified that he was shocked that Keough had been able to get it.

On August 9, 1985, Darnell and Keough were to meet for the cocaine-cough syrup/cash exchange. Approximately 1:30 p.m. that day, Keough left a message for Darnell. When Darnell called him back, Keough stated that he was impatient to consummate the deal. Darnell told Keough that his contact had not yet arrived. At that time, Velez was already at Darnell's house, but Swiatkowski had not yet arrived. Darnell, Swiatkowski and Velez were going to go to the Hawthorne Race Track. Darnell claimed that he never told Velez or Swiatkowski about the cocaine deals.

When Swiatkowski arrived, the three left to go to the track. Darnell told them that he had to meet someone at the Ford City Shopping Center on the way to the track. Approximately 3 p.m., Darnell delivered the cocaine to Keough at the shopping center. He saw Keough give the cocaine to a man in a van and then saw that man pull a gun. Thinking that he was going to be robbed, Darnell tried to escape.

Regarding the items found in his garage, Darnell testified that he received one of the scales as a souvenir from a doctor he had worked for and that he used the scales to make fishing weights. He denied ever having used the scales to measure drugs. Similarly, Darnell claimed that he used the lactose to fill hollow lures, and not to cut cocaine. With respect to the Demerol tablets, Darnell stated that they had been prescribed to him in 1976 for chronic back pain. However, they had upset his stomach so much, he discontinued using them.

On cross-examination by counsel for Velez, Darnell testified that before reaching the shopping center, he had stopped the car so that Velez could get into Swiatkowski's car. He did not want her in his car during the transaction. When she got out, he handed her the white shopping bag and asked her to hold it for him. Velez did not know that the bag contained cocaine. Darnell further stated that Swiatkowski had not brought the bag to his house and that Swiatkowski did not know what was in the bag either.

On cross-examination by the State, Darnell admitted that when he agreed to help Armstrong, he knew that it was illegal to deliver cocaine and that, with the exception of the night Armstrong had introduced Darnell to Keough, Armstrong had never been present at any cocaine deal or during any telephone conversation regarding cocaine deals. Approximately twice a week, Darnell went to the local tavern and saw Armstrong there every time. He admitted that he had been having an affair with Velez for approximately three years and stated that he had known Swiatkowski for approximately five years and saw him weekly at the tavern. Darnell further stated that before the Au-

gust 9, 1985, exchange took place, he thought that Keough might try to rip him off that day. However, he proceeded with the deal anyway.

Next, defendant Frances Velez testified that on August 9, 1985, approximately noon, she arrived at Darnell's house to meet him and Swiatkowski and then go to the Hawthorne Race Track. When she arrived, Darnell told her that they could not leave until he got a telephone call. After he received the call, the three left. Darnell told her and Swiatkowski that he had to meet someone at the Ford City Shopping Center to pick up some money before they went to the track. Initially, Velez rode with Darnell in his car. On the way to the shopping center, they stopped and Darnell told her to get into Swiatkowski's car and to take a white bag with her. She never looked in the bag. At the shopping center, Darnell told Velez and Swiatkowski to wait 10 minutes and he drove out of sight. When Darnell returned, Velez got out of Swiatkowski's car thinking that she was going to ride with Darnell. However, Darnell said, "no," and asked her to give him the white bag, which she did. Darnell then drove off and Velez and Swiatkowski followed him. The next thing she knew, a police car stopped them and they were arrested.

On cross-examination, Velez stated that she had never been curious about the contents of the white bag. When they were waiting at Darnell's house, he told them that he was waiting for a call from a guy who owed him money.

Defendant Joseph Swiatkowski then testified that on August 9, 1985, he arrived at Darnell's house approximately 12:30 p.m. and left about an hour later with Darnell and Velez after Darnell received a telephone call for which he had been waiting. Darnell told Swiatowski to follow him and that he had to make one stop on the way to the race track. When Velez got into Swiatkowski's car on the way to the shopping center, she was carrying what Swiatkowski thought was a white clutch purse. Velez told Swiatkowski that Darnell told her that he did not want her in his car when he got his money from the guy at the shopping center. At the shopping center, Darnell drove out of sight, then returned to get the white bag. When Darnell started to leave the second time, Swiatkowski followed him. He was then stopped by two cars and arrested. Swiatkowski claimed that he did not know what was in the white bag and had never discussed cocaine with anybody.

Following closing arguments, the court found the three defendants guilty of delivery of a controlled substance. Defense motions for new trial and arrest of judgment were denied. Following a hearing in aggravation and mitigation, the trial court sentenced each defendant

to six years' imprisonment. Each defendant appealed his or her conviction and the appeals were consolidated for review.

On appeal, the sole contention raised by Darnell is that he was entrapped by Bud Armstrong, a police informant, into committing the offense of delivery of a controlled substance and that the State failed to prove him guilty beyond a reasonable doubt by not rebutting his affirmative defense of entrapment. In response, the State argues that the evidence indicated beyond a reasonable doubt that Darnell was predisposed to the crime and, therefore, no entrapment occurred.

The affirmative defense of entrapment is defined in section 7—12 of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 7—12) as:

> "A person is not guilty of an offense if his conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of such person. However, this Section is inapplicable if a public officer or employee, or agent of either, merely affords to such person the opportunity or facility for committing an offense in furtherance of a criminal purpose which such person has originated."

■ Once the defendant presents some evidence of entrapment, the State must prove, beyond a reasonable doubt, that the defendant is not entrapped. (*People v. Tipton* (1980), 78 Ill. 2d 477, 401 N.E.2d 528.) To aid in the determination of whether entrapment has occurred, courts consider the following factors: (1) origination of the idea to commit the offense; (2) active encouragement of the suspect to commit the offense by the enforcement authorities; (3) purpose of the enforcement authorities' encouragement (*People v. Fisher* (1979), 74 Ill. App. 3d 330, 333-34, 392 N.E.2d 975); and (4) the defendant's predisposition to commit the offense. (*People v. Schillaci* (1988), 171 Ill. App. 3d 510, 526 N.E.2d 871.) In determining whether the defendant has been predisposed, the courts look at the defendant's initial reluctance or his ready compliance to commit the particular crime and defendant's familiarity with drugs and his willingness to accommodate the needs of drug users. If a defendant acceded to the crime readily and had a ready source for drugs, he will not be found to have been entrapped. (*People v. Schillaci* (1988), 171 Ill. App. 3d 510, 526 N.E.2d 871.) Further, entrapment will not be found to exist merely because a government official initiates a transaction with a defendant that leads to the sale of a controlled substance. *People v. Cross* (1979), 77 Ill. 2d 396, 396 N.E.2d 812, *cert. denied sub nom. Thomas v. Illi-*

*nois* (1980), 445 U.S. 929, 63 L. Ed. 2d 762, 100 S. Ct. 1316; *People v. Dennis* (1981), 94 Ill. App. 3d 448, 418 N.E.2d 479.

In the present case, defendant contends that the evidence fails to prove that he was predisposed to selling drugs. Defendant asserts that he has no prior criminal record; had never seen, used or trafficked in cocaine prior to the initial sale to Keough; and Armstrong coerced him into selling cocaine to Keough. Although the lack of a criminal record or previous narcotic involvement is relevant, it cannot overcome evidence of defendant's ability and willingness to make the unlawful sales when the opportunity presented itself. (*People v. Dennis* (1981), 94 Ill. App. 3d 448, 418 N.E.2d 479; *People v. Gonzales* (1970), 125 Ill. App. 2d 225, 260 N.E.2d 234.) Similarly, defendant's alleged fear and reluctance to sell drugs does not overcome the fact that he had engaged in a course of conduct involving similar offenses and had ready access to a drug supply. *People v. Beavers* (1986), 141 Ill. App. 3d 790, 491 N.E.2d 438.

Facts similar to those at bar were present in *People v. Beavers* (1986), 141 Ill. App. 3d 790, 491 N.E.2d 438, where the court found that entrapment did not exist. In *Beavers*, on June 5, 1984, Ira Beavers, defendant's ex-husband, informed a drug agent that defendant was selling drugs. Although Ira had witnessed only one drug sale by defendant, he told the agent that defendant had told him that she was selling drugs. The following day, Ira telephoned defendant and asked her to go to a drug supplier with him to purchase a gram of cocaine. When she hesitated, he reminded her that she owed him a favor. She then agreed.

After the purchase, Ira and an undercover drug agent arrived at defendant's house. Outside of the agent's presence, Ira asked defendant to sell the cocaine to the agent because his drug involvement would jeopardize his job. Ira then handed the gram to defendant and she delivered it to the agent. When the agent asked if she could get more, defendant answered that she could. At trial, defendant claimed that it was the first time she had sold drugs.

Between June 6 and June 8, defendant agreed to sell more cocaine to the agent. Even though Ira had not threatened her, she feared that if she refused, he would physically abuse her as he had in the past. On June 8, the agent called defendant to arrange for another purchase. Defendant obtained some cocaine from a supplier and sold it to the agent.

On June 13, the agent called defendant and asked her about buying some more cocaine. She said she would check with her supplier. When he called her back the next day, she said she could get it, but

the supplier had not picked it up yet. Defendant claimed that she tried to stall the agent, but feared problems with Ira if she refused to get the cocaine for the agent. On June 15, the agent called defendant twice. She contended that she tried to stall him again, but eventually sold him one-eighth ounce of cocaine. At that meeting, defendant also told the agent that she could get kilos of cocaine.

Thereafter, on June 20, the agent telephoned defendant to order one gram of cocaine for the next day and one-eighth ounce for the day after that. Defendant claimed that she called Ira on June 21 and told him that she did not like dealing. However, she ordered the cocaine from the supplier and sold two half-gram packets to the agent the next day and arranged to get him another one-eighth ounce.

On June 22, when the agent came to defendant's house to pick up the one-eighth ounce of cocaine, he waited at her door while she went to get it. When she handed it to him, eight police officers appeared, arrested her and conducted a search of her home. As a result of the search, the police officers found a sifter, two bottles of Anistol powder, two half-gram packages of cocaine, a cocaine mirror, a short straw, razor blades and a gram scale.

Similarly, in the present case, following the initial sale of drugs by Darnell to Keough at Armstrong's urging, Darnell made four additional sales to Keough. These additional sales were the ones for which he was indicted. There is no evidence that Armstrong was involved in any of the other sales. Further, Darnell not only initiated the cough syrup transaction at the first meeting, but he also negotiated the price with Keough without having to check with anyone and knew how much cough syrup and cash would be the equivalent value of 10 ounces of cocaine. In doing so, Darnell demonstrated a keen awareness of the use of drugs and their monetary value. In addition, Darnell had several labels which he used to check the contents of the bottle Keough had brought to be sure it was the right kind of cough syrup and gave Keough additional labels to see if he could procure other types of controlled substances. As in *Beavers*, Darnell's alleged reluctance to continue dealing and his alleged fear of physical harm are irrelevant in light of his continued course of dealing and his ready access to a drug supply.

Darnell's reliance on *People v. Martin* (1984), 124 Ill. App. 3d 590, 464 N.E.2d 837, and *People v. Poulos* (1990), 196 Ill. App. 3d 653, 554 N.E.2d 448, as support for his argument that he had been entrapped is misplaced. In *Martin*, defendant, age 21, worked in his parents' jewelry store during the day and went to public lounges at night. In April 1979, defendant met Nello. Nello asked defendant if he

had any cocaine, and, if not, if he would like some. Defendant told Nello that he never used cocaine. Nello then struck up a friendship with defendant by offering to help him sell some jewelry.

Thereafter, defendant began socializing with Nello and eventually began to use drugs, which Nello supplied to him free of charge. By the end of June, Nello was pressuring defendant to sell drugs, but he refused. At that point, defendant's parents sent him out of State for several months to break the drug habit. However, when he returned in September, he began to associate with Nello again and finally agreed to deliver drugs for Nello. At that time, Nello introduced defendant to two undercover drug agents. Nello told defendant that he owed the men a lot of money and he would not get paid if they knew it was Nello's cocaine.

On September 4, 1979, defendant and Nello met the two agents in a bar. Defendant noticed that one of the agents was wearing some of the jewelry Nello had sold for him, and defendant tried to sell the agent some more of the jewelry. However, the agent said that he was not interested in buying jewelry, but would like to buy some cocaine. Defendant then handed him a package of cocaine and the agent paid him $560, which defendant handed over to Nello as soon as they left the bar.

The next day, the agent called defendant at the jewelry store and wanted to buy more cocaine. Defendant refused to sell him any drugs. The agent kept calling on a daily basis, but defendant refused. On September 13, defendant went to another party at Nello's and Nello told him that defendant had to do him one more favor. Defendant refused, but Nello persisted. As a result, the next day, defendant called the agent and arranged to meet him at a restaurant. Nello had given him a package of cocaine and defendant was to collect $2,775. After the exchange, defendant gave the money to Nello.

On September 15, the agent called defendant again for more cocaine. Defendant refused. The agent continued to call, but defendant refused to see him again. Subsequently, defendant was arrested, tried and convicted of unlawful delivery of a controlled substance. On appeal, the reviewing court reversed the conviction on the ground that but for the relentless coercion by the informant and the persistence of the agents, defendant would not have been predisposed to commit the offense.

A similar pattern of persistence and informant-involvement was present in *People v. Poulos* (1990), 196 Ill. App. 3d 653, 554 N.E.2d 448, where defendant, owner of a video game room, was repeatedly asked by Budaj, the previous owner of the game room, to sell cocaine

to an undercover agent. Budaj was a police informant and would regularly stop by the game room for business purposes as well as to try to convince defendant to sell some cocaine. This harassment persisted over a two-month period until one evening, Budaj purchased some cocaine from a third party in defendant's presence at the game room. When the sale was completed, the informant asked defendant to do him a favor and sell the cocaine to another party, the undercover agent, for $1,100. Defendant relented. After the sale, he gave all of the money to Budaj, but Budaj allegedly insisted that defendant keep $100 for himself. Although there was some evidence that defendant discussed subsequent sales with the undercover agent, no subsequent sales took place. Defendant was arrested and convicted of delivery of a controlled substance. On appeal, the *Poulos* court held that defendant had been entrapped. In reaching its decision, the court noted that: (1) there had been no evidence of subsequent narcotics-related activities; (2) the single offense was committed after two months of persistent urging; (3) the informant supplied the cocaine; (4) the informant directed all conversations between defendant and the undercover agent; and (5) defendant had never been involved previously with drugs.

The coercion and persistence present in *Martin* and *Poulos* are markedly absent from the present case. Darnell's refusal and acquiescence to Armstrong's demands occurred in a short period of time on one evening. Although Darnell alleges that he had stalled Keough a few times, the record indicates that he promptly followed through on every one of Keough's requests for drugs. Further, in *Martin* and *Poulos*, the respective informants supplied the drugs. By contrast, in the present case, after the first transaction for which Darnell was not indicted, Darnell had direct access to a supplier, did not involve Armstrong, and initiated his own negotiations.

■ Darnell further argues that the extent of government involvement in the drug transactions demonstrates entrapment. In support of this contention, Darnell cites to his initial reluctance to sell cocaine; the facts that Armstrong supplied the cocaine, price, customer, time and location for the first sale; Armstrong's alleged badgering; and Keough's alleged relentlessness. These grounds are unpersuasive. As previously stated, more important than Darnell's initial reluctance and the fact that Armstrong may have badgered him initially is the fact that Darnell made four subsequent drug sales to Keough. There is no evidence that Darnell told Keough at anytime that he would not sell him cocaine and that Keough continued to harass him until he agreed to do so. To the contrary, Darnell satisfied every drug request made

by Keough and never indicated to Keough that he was doing so against his will. Further, although Armstrong had supplied the cocaine, customer, time and location for the first transaction, Darnell took care of those details for every subsequent transaction and took the initiative to enlarge the scope of the transactions to include codeine-based cough syrups. In fact, when Keough indicated that he could secure the first syrup requested by Darnell, Darnell gave him a list of additional cough syrups he was interested in purchasing. Entrapment does not exist when police act to detect such persons as Darnell who are ready and willing to commit further crimes. (*People v. Boalbey* (1986), 143 Ill. App. 3d 362, 493 N.E.2d 369.) Even viewing Darnell's testimony in the light most favorable to him (*People v. Connor* (1988), 176 Ill. App. 3d 900, 531 N.E.2d 966), we conclude that the trial court properly ruled that entrapment did not exist. Finally, although we recognize that the State's failure to call an informant to testify generally gives rise to an inference against the State (*People v. Poulos* (1990), 196 Ill. App. 3d 653, 554 N.E.2d 448), in light of the evidence as to Darnell's willingness and ability to commit future crimes and his consummation of those crimes, we find that inference unpersuasive.

Next, Velez and Swiatkowski contend that they were denied their right to a fair trial by the admission of the unreliable hearsay testimony of Officer Keough regarding statements allegedly made by Darnell which implicated Velez and Swiatkowski. At trial, during the State's direct examination of Officer Keough, the following questioning took place:

"[STATE]: While you were in your car with the defendant in the Ford City parking lot at that time was there any conversation?

[KEOUGH]: Yes.

[STATE]: What did [Darnell] state to you and what did you state to him?

[KEOUGH]: He wanted to see the 40 gallons of syrup. And at that time I told him that I wanted to see the cocaine. And he said that, 'I have got 2 people with me.' And he said, 'This guy doesn't want the cocaine and the money in the car at the same time.'

\* \* \*

[STATE]: Did the defendant state to you what the other two people were doing?

[KEOUGH]: He just said that they didn't want the money and the cocaine at the same time. That they were there to make sure that they didn't lose the cocaine.

\* \* \*

[STATE]: What happened after the defendant Darnell counted the money?

[KEOUGH]: He gave me the money back and he said, 'Well, let me go see what they want to do.' He got out of his car and got back into his vehicle, got out of my car and got back into his vehicle and drove out of my view."

Velez and Swiatkowski contend that Officer Keough's comments constituted inadmissible hearsay because they were used as substantive evidence to prove that Velez and Swiatkowski were partners with Darnell in the cocaine deal, and that the co-conspirator's exception to the hearsay rule does not apply because a *prima facie* case as to conspiracy had not been established independent of Keough's statements. In response, the State argues that Velez and Swiatkowski have waived this issue for review because of their failure to object to the hearsay statements at trial or to allege with specificity in the post-trial motion that the statements constituted error.

■ It is well established that alleged trial errors not objected to at trial or preserved with specificity in a post-trial motion are waived on review. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) Moreover, hearsay evidence admitted without objection is properly considered by the court and is to be given its natural probative effect. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267; *People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.) However, if the evidence is closely balanced and an innocent person may be convicted due to some obvious error which had not been properly reserved for review, the reviewing court may consider the error under the plain error doctrine. *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124; 107 Ill. 2d R. 615(a).

■ In the present case, the record supports the State's waiver argument. However, in light of the paucity of evidence in the record implicating Velez and Swiatkowski in a conspiracy to sell drugs, we elect to invoke the plain error doctrine and to review the issue as to whether the co-conspirator's exception to the hearsay rule is a proper ground for admitting Officer Keough's testimony implicating Velez and Swiatkowski.

■ The co-conspirator exception permits declarations made in furtherance of and during the pendency of the conspiracy to be admitted provided that there is an independent *prima facie* showing of a conspiracy. (*People v. Parmly* (1987), 117 Ill. 2d 386, 512 N.E.2d 1213.) Although proof of the illicit association between declarant and defendant may be totally circumstantial (*People v. Duckworth* (1989), 180 Ill. App. 3d 792, 536 N.E.2d 469), it must evidence an agreement between the declarant and defendant and the proof must be sufficient, substantial and independent of the declarations. Mere knowledge or acquiescence of an illegal act does not constitute conspiracy. *People v. Deatherage* (1984), 122 Ill. App. 3d 620, 461 N.E.2d 631.

In *People v. Duckworth* (1989), 180 Ill. App. 3d 792, 536 N.E.2d 469, this court addressed a situation similar to the one at bar. Defendant Charles Duckworth was tried jointly with codefendant Tammy Duckworth on charges that they had knowingly delivered a controlled substance. Both defendants were found guilty. The facts underlying the convictions were as follows. In July 1987, undercover agent Richard Scott heard through a confidential source about a potential drug contact, Tammy Duckworth. On July 8, 1987, Scott called Tammy. She agreed to sell him three ounces of cocaine every three to four weeks and informed Scott that she would get the cocaine for $1,400 an ounce through an uncle who lived next door to her. They made arrangements to consummate the deal on July 10 at the Village Mall.

On the day of the meeting, Scott and a surveillance team went to the mall. Tammy had told Scott that she would be arriving in a white Buick. When he saw a vehicle matching that description pull into the parking lot, he waved the driver over and asked her if her name was "Tammy." When she said it was, Scott got into her car. At that point, she told him that her uncle was going to be the source and her uncle had to show his supplier the money before he could get the cocaine. Scott refused to turn over the money without getting the cocaine. However, he suggested that her uncle drive to the mall and park near them. She could then go between the cars with the cocaine and the money.

Tammy left the mall for a brief period and when she returned, told Scott that she could only get 1½ ounces of cocaine. Scott agreed to purchase the lesser amount. Tammy then left the mall again and returned with two bags of cocaine. When Scott started to count the money, he signalled to the surveillance units and they converged on the scene and arrested Tammy.

Robert Putnam, one of the surveillance units who had witnessed the first two contacts between Tammy and Scott, saw a blue van enter the parking lot and park near Scott. Tammy exited from the passenger side of the van and entered Scott's car. At that point, Scott indicated that a delivery had been made. Putnam and another officer approached the van and ordered the man inside, defendant Charles Duckworth, to exit.

On appeal, defendant argued that the trial court improperly admitted testimony by Scott that Tammy had told him that her uncle would be the source and that she would speak to her uncle about his coming to the mall. Defendant claimed that the testimony did not fall within the co-conspirator exception to the hearsay rule because the State had failed to prove the existence of a conspiracy through independent evidence. The appellate court agreed on the grounds that the defendant's mere appearance at the scene did not establish an illicit association between defendant and Tammy.

█ In the present case, the lack of evidence as to the involvement of Velez and Swiatkowski in Darnell's drug sales is similar to that in *Duckworth*. Here, Keough conducted drug buys with Darnell on five different occasions. Velez and Swiatkowski were in the vicinity during the last buy only. At that time, Officer Cummings observed Velez, who was a passenger in Swiatkowski's car, hand a white bag to Darnell. This bag was subsequently given to Keough and was found to contain cocaine. Similar to *Duckworth*, there is no independent evidence of an agreement between Darnell and Velez and Swiatkowski. It is axiomatic that, without evidence of an agreement, a conspiracy cannot be established. (*People v. Deatherage* (1984), 122 Ill. App. 3d 620, 461 N.E.2d 631.) Both Velez and Swiatkowski claim they had never even looked inside the bag. However, even if they had and had discovered that it contained cocaine, mere knowledge of an illegal act or acquiescence to it does not constitute conspiracy. *Deatherage*, 122 Ill. App. 3d 620, 461 N.E.2d 631.

The present facts are distinguishable from those in *People v. Goodman* (1980), 81 Ill. 2d 278, 408 N.E.2d 215, where the court found that there was sufficient independent evidence of conspiracy to render applicable the co-conspirator's exception to the hearsay rule. In *Goodman*, in defendant's presence, the declarant announced to the agent that he had the cocaine; declarant and defendant were seen having a discussion immediately after the agent requested a test of the cocaine and agreed to put down $1,000 for security; and defendant was seen affirmatively nodding his head and receiving the $1,000 in cash. The court concluded that this was evidence from which an

agreement to sell cocaine could be inferred. No affirmative acts of agreement have been established in the present case.

Next, Velez and Swiatkowski contend that the State failed to prove them guilty of delivery of a controlled substance beyond a reasonable doubt on the accountability theory. Specifically, Velez and Swiatkowski contend that the evidence against them was entirely circumstantial and that the State failed to establish their guilt so as to exclude every reasonable hypothesis of innocence. In response, the State argues that the evidence supports the trial court's finding that they were accountable for Darnell's actions and that they were proven guilty beyond a reasonable doubt.

■ To sustain a conviction of unlawful delivery based on an accountability theory, the State must establish beyond a reasonable doubt that: (1) the defendant solicited, ordered, abetted, agreed or attempted to aid another in the planning or commission of the delivery; (2) the defendant's participation took place before or during the commission of the delivery; and (3) the defendant had the concurrent, specific intent to promote or to facilitate the commission of the offense. (Ill. Rev. Stat. 1989, ch. 38, par. 5—2; *People v. Deatherage* (1984), 122 Ill. App. 3d 620, 461 N.E.2d 631.) Defendant's mere presence at the scene does not render him accountable. There must be proof of the requisite intent and that defendant aided, abetted or attempted to aid another in the perpetration of the crime. (*People v. Evans* (1981), 87 Ill. 2d 77, 429 N.E.2d 520.) Further, if defendant's involvement rests solely on circumstantial evidence, the facts proved must be inconsistent with any reasonable hypothesis of innocence. *People v. Evans* (1981), 87 Ill. 2d 77, 429 N.E.2d 520.

In the present case, Velez and Swiatkowski argue that there was no evidence that either of them knew that Darnell was involved in a cocaine deal. The testimony of the three indicated that on their way to the race track, they stopped at the Ford City Shopping Center so that Darnell could meet someone who was going to give him some money. Velez left Darnell's house as a passenger in Darnell's car and before arriving at the shopping center, changed cars at Darnell's request and rode with Swiatkowski. When Velez changed cars, Darnell told Velez to take a white shopping bag with her to Swiatkowski's car. She took it without asking about it or looking at the contents. Later, at the shopping center, when Darnell asked her for the bag, she gave it to him. Further, Darnell testified that neither Velez nor Swiatkowski knew anything about the cocaine deals.

In response to the contention by Velez and Swiatkowski that the State failed to prove them guilty by accountability beyond a reason-

able doubt, the State argues that the trial court could reasonably infer from the defendants' presence at the scene and their active participation in the transaction as well as from the inconsistencies in their testimony that Velez and Swiatkowski had agreed to facilitate the consummation of the delivery of cocaine. We find this argument unpersuasive on the ground that the alleged evidence and inconsistencies relied upon by the State are predicated on speculative implications and a misinterpretation of the record.

■ With respect to defendants' presence at the scene, it is well established that mere presence at the scene of the crime, even coupled with knowledge that a crime is being committed, is not sufficient to establish guilt on an accountability theory. (*People v. Deatherage* (1984), 122 Ill. App. 3d 620, 461 N.E.2d 631.) In *Deatherage*, defendant and codefendant Cabage were indicted for the unlawful delivery of cocaine. Defendant was tried separately before a jury, convicted and sentenced to three years' imprisonment. The State's case was based on an accountability theory. At defendant's trial, undercover agent Simmons, the sole occurrence witness, testified that defendant was present at the Sports Page Tavern at approximately 1:45 p.m. on February 11, 1982, when Simmons and a fellow agent, DuPoy, walked into the bar. DuPoy and Cabage talked for a while and then went outside to the parking lot. Simmons and DuPoy left and Cabage returned to the bar. A short time later, Simmons and DuPoy returned to the tavern to purchase some cannabis from Cabage. When Simmons entered the bar, he saw Cabage, and the two went outside, where Simmons arranged the purchase. Simmons then asked if he could taste some cocaine. Cabage replied that he would have to contact another "guy." The two arranged for Simmons to call Cabage at home later that day. Simmons did not see defendant at all during this meeting.

Instead of calling Cabage later that day, Simmons and DuPoy drove to his house. Cabage met them at the door. Defendant was sitting in the living room watching television. When Simmons expressed concern about defendant's presence, Cabage told him not to worry and showed Simmons a sample of cocaine. When Simmons asked Cabage if he could get more cocaine, Cabage asked defendant what the source had said about the price. Defendant replied that it was $200 a gram.

As Simmons and Cabage were leaving to go outside to get the cannabis, Simmons asked defendant if he could get more cocaine from the source. Defendant started to answer, but was interrupted by Cabage. Simmons and Cabage then went outside, took a carton from Cabage's car and returned to the house. The cannabis buy took place in

the bedroom, outside of defendant's presence. Simmons then asked Cabage who could get him more cocaine in the future. Cabage answered that he would have to "go through that guy plus another guy." Simmons understood "that guy" to refer to defendant. Simmons and DuPoy then left the house.

On appeal, the court held that, although defendant was present at Cabage's home on one occasion and had answered a question about the price of cocaine, mere presence at the scene of a crime and knowledge that a crime was being committed were insufficient to establish guilt. Further, the court stated that when the evidence is circumstantial, guilt must be established so as to eliminate all reasonable hypotheses of innocence. (122 Ill. App. 3d at 624.) With respect to Deatherage, the court recognized that he obviously had some knowledge of the cocaine trade, but found it possible that he was merely an innocent bystander to the sale.

■■ In the present case, there is no evidence that Velez and Swiatkowski knew that a crime was being committed. Nevertheless, based on the following, the State contends that they had actively participated in the offense. First, the State argues that Swiatkowski brought the cocaine to Darnell's house and transported it to Ford City. The State bases this conclusion on Officer Pariso's testimony that he did not observe any of the defendants carry packages from Darnell's house and he did not observe Velez carry anything from Darnell's car to Swiatkowski's car when she switched cars. In our view, Officer Pariso's testimony is nothing more than a statement concerning what he saw from his vantage point on a side street near Darnell's house and from some point near where Velez switched cars. The implication that Swiatkowski was the supplier is purely speculative and is not supported by the evidence. Moreover, we find that there is even less evidence of accountability in the present case than there was in *Deatherage* in that there is no evidence that either Swiatkowski or Velez had any knowledge that a cocaine deal was taking place. As in *Deatherage*, it is possible that they were merely innocent bystanders.

The State further relies on the following alleged inconsistencies in defendants' testimony as grounds for the trial court's decision. First, the State contends that Officer Cummings' testimony that he saw Velez enter Darnell's car at Ford City, talk to him for a few minutes, get the bag from Swiatkowski's car and give it to Darnell is inconsistent with Velez's testimony which "implied" that she did not actually enter Darnell's car in the parking lot and that she knew a cocaine deal was in progress. A review of Velez's testimony indicates that she never ex-

plicitly stated she did or did not enter Darnell's car in the parking lot. Moreover, whether or not she had entered the car is irrelevant to the issue of whether she knew a cocaine deal was in progress. The undisputed facts are that Darnell drove up to Swiatkowski's car, Velez got out, talked to Darnell, walked back to Swiatkowski's car, got the plastic bag, handed it to Darnell, and got back into Swiatkowski's car. Darnell then drove back to where Keough was waiting. Again, we find no inconsistent testimony as to the relevant facts.

Second, the State contends that Swiatkowski's testimony that after the package had been passed to Darnell, he moved his car so that he could see where Darnell was going is inconsistent with Swiatkowski's statement that he had moved only a few feet. This contention is directly contradicted by the record. On both direct and cross-examination, Swiatkowski was consistent in his testimony that he had moved his car "a little bit" and a "couple of spots" so as to see when Darnell left the parking lot.

Third, the State argues that Swiatkowski's statement that he had followed Darnell to Ford City was inconsistent with Darnell's testimony that he had followed Swiatkowski. Contrary to the State's contention, Darnell did not testify that he had followed Swiatkowski. Instead, Darnell stated, "I said we're going to Ford City. I had never been there before and Jay [Swiatkowski] had an idea where to go." Moreover, Officer Pariso corroborated Swiatkowski's statement that he had followed Darnell to the shopping center. We find no inconsistency in these statements.

Fourth, the State argues that Velez's statement that she saw Darnell carry the white bag from the house is inconsistent with her later statement that she saw the bag for the first time in Darnell's car. Contrary to the State's argument, Velez did not testify that she saw the bag for the first time when she was in Darnell's car. Instead, she testified that, when she picked up the bag to carry it to Swiatkowski's car, she realized for the first time that what Darnell had carried out to his car was not his back brace. Again, we find no inconsistency in the testimony.

Finally, the State contends that Velez's testimony that Darnell had given her no explanation for transferring the bag to her is inconsistent with Swiatkowski's statement that Velez told him that Darnell had told her that he did not want her in the car when he got his money. Contrary to the State's attempt to find an inconsistency, the record clearly indicates that Velez and Swiatkowski were discussing two different transfers. Velez was referring to the transfer of the bag from Darnell to her. Swiatkowski was testifying as to the reason

given to Velez by Darnell for switching cars. There was no inconsistency. Therefore, based on the foregoing analysis, we conclude that there was insufficient evidence to find Velez and Swiatkowski guilty of unlawful delivery of a controlled substance based on an accountability theory beyond a reasonable doubt.

The present case is distinguishable from the situation in *People v. Pintos* (1988), 172 Ill. App. 3d 1096, 527 N.E.2d 312, *aff'd* (1989), 133 Ill. 2d 286, 549 N.E.2d 344, where the court held that defendant was proven guilty beyond a reasonable doubt of intent to deliver a controlled substance on an accountability theory. The *Pintos* court based its decision on the totality of circumstances, which it found indicated that defendant had knowledge that the package he had transported contained cocaine. The circumstances specifically noted by the court are: defendant and codefendant Sosa arrived in Chicago from Florida, carrying a large, gift-wrapped package which they took to the Chicago hotel room of codefendant Diaz, also from Florida. Diaz had previously made arrangements with an undercover agent to sell the agent eight kilograms of cocaine which he told the agent would be delivered from Florida. Defendant and Sosa stayed in a room next to Diaz's room and kept the large package in their possession overnight. The next day, after the agent arrived at Diaz's room to consummate the deal, Diaz went to defendant's room and brought the package back to his room. The flaps on the box were open and protruded up an inch or two from the surface of the box. The box was found to contain nine individually wrapped kilograms of cocaine. Based on the evidence, the court found Pintos guilty beyond a reasonable doubt of intent to deliver a controlled substance on an accountability theory.

In contrast to *Pintos*, in the present case, Velez and Swiatkowski were in possession of the white bag for only a matter of minutes and there is no evidence that the bag had been opened during that time and the contents examined. Mere speculation that they may have opened the bag is insufficient to support a finding of guilt beyond a reasonable doubt. See *People v. Deatherage* (1984), 122 Ill. App. 3d 620, 461 N.E.2d 631.

Moreover, as further support for our decision, the trial court's comments at sentencing and the minimum sentence itself indicate that the trial court was not convinced beyond a reasonable doubt as to Swiatkowski's and Velez's guilt by accountability. Specifically, the court stated:

> "If I am wrong in terms of their accountability in this, then the Appellate Court can at will reverse my finding, my judgment,

and Swiatkowski and Velez especially I think they're in somewhat of a different category than Darnell.

\* \* \*

And in the meantime I will allow the Defendant to remain out on appeal so that if the accountability wasn't there or the entrapment wasn't there for Darnell, but especially Velez and Swiatkowski, that they will not have been imprisoned for no good sufficient and legal reason."

Accordingly, based upon the foregoing, the judgment of the trial court as to Darnell is affirmed; and the judgment as to Velez and Swiatkowski is reversed.

Affirmed in part; reversed in part.

O'CONNOR and MANNING, JJ., concur.