THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DERRICK WALKER, Defendant-Appellant.

First District (2nd Division)   No. 1—92—0725

Opinion filed May 10, 1994.

Michael Pelletier and Debra Salinger, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Rebecca Davidson, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARTMAN delivered the opinion of the court:

Defendant Derrick Walker, convicted by a jury for first degree murder (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(a) (now 720 ILCS 5/9—1(a) (West 1992))), appeals. He raises as issues whether (1) the State proved beyond a reasonable doubt that he was accountable for the acts of the shooter; (2) the circuit court erred in admitting the victim's hearsay statements; (3) the circuit court erred in failing to determine that he was fit to stand trial; (4) he was denied a fair trial by the prosecutor's statements in closing argument; and (5) his sentence is excessive.

There was evidence from which the jury could believe the following facts. When defendant lived in Vice Lord territory, he became a member of the Vice Lord street gang. After he moved to a new neighborhood, he switched alliances and became a member of the Disciples street gang. On March 11, 1991, defendant learned that his brother had been severely beaten by Vice Lord gang members and decided to retaliate. Any Disciples who sought to leave the neighborhood and "involve [them]selves" were required to have "security" with them. Defendant asked Anthony Owens, "coordinator" of the Disciples, for permission to leave the neighborhood and involve himself in a "gangbang." Defendant and Owens went to Owens' car where the latter retrieved a .38 snubnose revolver in a plastic bag.

Owens removed the gun and gave it to Shaundell Green, the "chief enforcer" of the Disciples, who was "on security" at that time. Defendant had seen Green shoot somebody at a prior time.

Defendant, Owens, Green, and a fourth person, known only as Maurice, got into Owens' car. Maurice was there to watch defendant's back. They first drove to defendant's mother's house so that he could speak with her before doing anything. She was not at home. Defendant next spoke to his sister and some friends. Defendant was told that the victim, Keith Byrd, beat his brother along with a man called Pluky and a man named Bobby Ramsey. The four men left to find the victim.

Owens drove to the victim's home at 1136 West 95th Place in Chicago, with defendant in the front passenger seat and Green and Maurice in the back seat. The victim and a man named Errion Hayden were sitting on the porch. After driving past the house, Owens parked nearby. Defendant and Green got out of the car and approached the victim and Hayden.

Hayden testified that the victim asked defendant if he had heard what Pluky did to his younger brother, to which defendant replied he had. Green then pulled out a gun, and the victim ran. As the victim ran, defendant pointed at him with his index finger, his arm outstretched. Green ran after the victim at whom he shot three times. As Green was running and shooting, defendant ran right with him. Hayden ran into the middle of the street, where he saw Green fire a fourth shot, which felled the victim. Defendant was still next to Green. While the victim was down, Green went "up on him and shot him again." Defendant then was four feet away from Green. Defendant and Green thereafter ran towards Hayden, who heard defendant instruct Green to "shoot him, too." Hayden escaped.

Paulette Byrd, the victim's sister, was in the house when she heard gunshots. She went outside and saw the victim lying in the gangway. Paulette asked what happened and he said he had been shot. She left and called an ambulance, which took about 1 1/2 to 2 minutes, and then returned to her brother. Upon Paulette's inquiry, the victim told her he had been shot twice in the back. When she asked the victim who did it, he replied, "Derrick Walker did it." Defendant's motion *in limine* to exclude these hearsay statements from trial was denied by the circuit court because it found the statements admissible under both the dying declaration and spontaneous declaration exceptions to the hearsay rule. The victim died two days later in Christ Hospital's intensive care unit.

Defendant's written statement to police was read to the jury. He admitted going to the victim's house with Owens, Green, and Mau-

rice, but claimed he stayed in the car while Green and Maurice approached the victim. He asserted that he was in the car when Green shot the victim. Defendant acknowledged that he was "going over there to fight." Afterwards, he left the scene with Green; went to a restaurant where he purchased food for Green; and the two then went to defendant's home.

The jury found defendant guilty of first degree murder. He was sentenced to 35 years' imprisonment. Green, tried simultaneously before the bench, was also found guilty of first degree murder and sentenced to 35 years' imprisonment. Defendant appeals.

## I

Defendant initially contends that the State failed to prove beyond a reasonable doubt that he was accountable for Green's act of shooting the victim.

The relevant inquiry is whether the evidence, viewed in the light most favorable to the State, supports any rational trier of fact in finding that the essential elements of the crime had been proven beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267.) The elements of accountability are: (1) defendant elicited, aided, abetted, agreed, or attempted to aid another person in the planning or commission of the offense; (2) defendant's participation took place before or during the commission of the offense; and (3) defendant had the concurrent, specific intent to promote or facilitate the commission of the offense. (Ill. Rev. Stat. 1991, ch. 38, par. 5—2 (now 720 ILCS 5/5—2 (West 1992)); *People v. Valen* (1989), 183 Ill. App. 3d 571, 577, 539 N.E.2d 261.) Mere presence at the scene of the crime, even with knowledge that the crime is being committed, is not sufficient to establish guilt on the accountability theory. (*People v. Darnell* (1990), 214 Ill. App. 3d 345, 363, 573 N.E.2d 1252.) Further, mere presence combined with flight from the scene does not establish accountability. *In re Woods* (1974), 20 Ill. App. 3d 641, 650, 314 N.E.2d 606.

The State insists defendant is accountable under the common-design rule, which provides that " 'where two or more persons engage in a common criminal design or agreement, any acts in the furtherance thereof committed by one party are considered to be the acts of all parties to the common design and all are equally responsible for the consequences of such further acts.' " (*People v. Terry* (1984), 99 Ill. 2d 508, 514, 460 N.E.2d 746, quoting *People v. Kessler* (1974), 57 Ill. 2d 493, 496-97, 315 N.E.2d 29; Ill. Rev. Stat. 1991, ch. 38, par. 5—2(c) (now 720 ILCS 5/5—2(c) (West 1992)).) Common design can be inferred from the circumstances surrounding the perpetration of unlawful

conduct, including: presence at the scene without disapproval or opposition, continued close association with the perpetrators after the crime, and failure to report the incident to the police. (*People v. Watts* (1988), 170 Ill. App. 3d 815, 825, 525 N.E.2d 233.) The existence of a common design is a question of fact for the jury. *Watts*, 170 Ill. App. 3d at 825.

■ Here, the record supports the jury's conclusion, holding defendant accountable for the victim's murder. The evidence shows that defendant himself instigated the events which led to the victim's death, as he sought to retaliate for his brother's beating. He obtained permission from his gang coordinator to leave the neighborhood and "gangbang." Green, "on security" for the Disciples street gang, was asked to accompany defendant under the direction of the gang coordinator. Defendant knew Green had a gun and was the gang's "chief enforcer." He also had seen Green shoot someone before. Once defendant learned the victim had beaten his brother, they drove to the victim's home. Together, defendant and Green approached the victim. After defendant and the victim exchanged words concerning the brother's beating, Green pulled out the gun and the victim ran. Defendant pointed to the victim and ran beside Green as he fired shots at the latter. Moreover, he stayed with Green as Green walked up on the fallen victim and shot him from close range. Defendant and Green then chased Hayden, with defendant instructing Green to "shoot him, too." Afterwards, defendant remained in close association with Green as they left the scene together, went to a restaurant where defendant purchased food for Green, and then went to defendant's home. Defendant never reported the murder to police.

Defendant challenges Hayden's credibility, claiming it is unlikely that Hayden could have heard him tell Green to "shoot him, too," because Hayden was not wearing his hearing aid. Questions of credibility and determinations of factual disputes are within the province of the trier of fact. (*People v. Bradford* (1985), 106 Ill. 2d 492, 502, 478 N.E.2d 1341.) The jury heard Hayden's testimony and found it credible.

Defendant also suggests that his act of pointing to the fleeing victim was not for Green's benefit. Drawing reasonable inferences from the evidence is within the province of the trier of fact. (*People v. Stanciel* (1992), 153 Ill. 2d 218, 235, 606 N.E.2d 1201.) Under the facts presented here, the jury had the right to infer that defendant was pointing at the victim to indicate to Green whom he was to shoot.

The jury was entitled to believe the State proved beyond a reasonable doubt that defendant is accountable for the victim's murder.

## II

Defendant asserts that the victim's statements to his sister should not have been admitted under the dying declaration exception or the spontaneous declaration exception to the hearsay rule. The State insists that the statements properly were admitted under both exceptions.

Statements of fact by the victim concerning the cause and circumstances of a homicide are admissible when: (1) they are made by the victim under the fixed belief and moral conviction that death is impending and certain to follow almost immediately; (2) the victim is in possession of his or her mental capacities; and (3) the court determines, outside the presence of the jury, that the elements are present beyond a reasonable doubt. (*People v. Lawson* (1992), 232 Ill. App. 3d 284, 292, 596 N.E.2d 1235, citing *People v. Tilley* (1950), 406 Ill. 398, 94 N.E.2d 328.) In determining whether a particular statement constitutes a dying declaration, a court will look to all the facts and circumstances surrounding the statement, including the grievous nature of the victim's wounds, as evidence of the victim's state of mind. (*Lawson*, 232 Ill. App. 3d at 292-93, citing *People v. Webb* (1984), 125 Ill. App. 3d 924, 934-35, 466 N.E.2d 936.) The circuit court's determination of whether a particular statement constitutes a dying declaration will not be reversed on appeal unless its findings are palpably contrary to the manifest weight of the evidence. (*Webb*, 125 Ill. App. 3d at 934.) Here, although there was no direct evidence that defendant believed his death was impending and certain to follow almost immediately, there was evidence that the victim complained of being unable to breathe, he knew he had been shot twice in the back, he was bleeding from his wounds, and was in such pain that he asked that no one touch him. We cannot say, under these facts, that the court's finding of a dying declaration was palpably contrary to the manifest weight of the evidence.

The court also found the victim's statements to be spontaneous declarations. A statement qualifies as a spontaneous declaration when three factors are established: (1) the occurrence of an event sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) the relationship of the statement to the circumstances of the occurrence. (*People v. Shum* (1987), 117 Ill. 2d 317, 343, 512 N.E.2d 1183.) A totality of the circumstances approach is employed. (*People v. Jarvis* (1987), 158 Ill. App. 3d 415, 422, 511 N.E.2d 813.) It is clear that in the course of human reaction to being shot, the event is sufficiently startling. Here, the victim made his remarks to his sister within a few minutes of the event. Finally, the statement was ineluctably related to the occurrence. The victim's response to the question "what happened"

did not make his statement inadmissible. (*People v. Damen* (1963), 28 Ill. 2d 464, 472, 193 N.E.2d 25; *People v. Balle* (1992), 234 Ill. App. 3d 804, 817, 601 N.E.2d 788; *People v. Miller* (1978), 58 Ill. App. 3d 156, 160, 373 N.E.2d 1077.) Nor did the statement made identifying defendant as the shooter in response to a question necessarily destroy its spontaneity. (*People v. Smith* (1992), 152 Ill. 2d 229, 258-59, 604 N.E.2d 858; *People v. Nevitt* (1990), 135 Ill. 2d 423, 445-46, 553 N.E.2d 368; *People v. Gacho* (1988), 122 Ill. 2d 221, 242, 522 N.E.2d 1146.) The court's finding that the victim's utterances qualified as spontaneous declarations was well within its considerable discretion. (*People v. Ikpoh* (1993), 242 Ill. App. 3d 365, 390, 609 N.E.2d 1025; *People v. James* (1990), 200 Ill. App. 3d 380, 389, 558 N.E.2d 732.) There was no error.

## III

Defendant argues that the circuit court erred in failing to determine whether he was fit to stand trial. Defendant's assertion is based solely upon the presentence investigation report, which indicated that he twice attempted to commit suicide, once following his arrest but prior to trial, and once the year before his arrest. The probation officer never verified defendant's claimed suicide attempts. The report also stated that defendant was not being treated for any mental health problems at the time. The report was distributed after trial, but prior to the sentencing hearing.

The parties correctly note that it is a violation of due process to convict a person who is unfit to stand trial. (*People v. Eddmonds* (1984), 101 Ill. 2d 44, 56, 461 N.E.2d 347.) In Illinois, a defendant is presumed to be fit. (Ill. Rev. Stat. 1991, ch. 38, par. 104—10 (now 725 ILCS 5/104—10 (West 1992)).) The issue of defendant's fitness, however, may be raised at any time by the court, the State or the defense. Ill. Rev. Stat. 1991, ch. 38, par. 104—11(a) (now 725 ILCS 5/104—11(a) (West 1992)); *People v. Brown* (1985), 131 Ill. App. 3d 859, 863-64, 476 N.E.2d 469; *People v. Johnson* (1984), 121 Ill. App. 3d 859, 860, 460 N.E.2d 336.

Fitness is defined as the ability to understand the nature and purpose of the proceedings and the ability to assist in one's own defense. (Ill. Rev. Stat. 1991, ch. 38, par. 104—10 (now 725 ILCS 5/104—10 (West 1992)).) A defendant is entitled to a fitness hearing only if there is a *bona fide* doubt as to his or her fitness. (Ill. Rev. Stat. 1991, ch. 38, par. 104—11(a) (now 725 ILCS 5/104—11(a) (West 1992)).) The determination of whether there is a *bona fide* doubt of defendant's fitness is based on evidence of irrational behavior, demeanor at trial, and any prior medical opinions. (*People v. Eddmonds* (1991), 143 Ill.

2d 501, 578 N.E.2d 952.) *Some* doubt of a defendant's fitness is not enough. (*Eddmonds*, 143 Ill. 2d at 513.) The critical inquiry is whether the facts presented a *bona fide* doubt that defendant understood the nature and purpose of the proceedings and was able to assist in his or her own defense. *People v. Fowler* (1991), 222 Ill. App. 3d 157, 164, 583 N.E.2d 686.

Fitness addresses only a person's ability to function within the context of a trial; it does not refer to sanity or competence in other areas. (*Fowler*, 222 Ill. App. 3d at 164.) A person can be fit for trial although his or her mind is otherwise unsound. (*Fowler*, 222 Ill. App. 3d at 164.) No single factor in itself raises a *bona fide* doubt of a defendant's fitness to stand trial; even the fact that a defendant suffers a mental disturbance or requires psychiatric treatment does not necessarily raise a *bona fide* doubt. *Fowler*, 222 Ill. App. 3d at 164.

The State argues that there never was a *bona fide* doubt as to defendant's fitness because the record reveals no irrational behavior, a proper demeanor at trial, and no prior medical opinions. Moreover, the record reveals that he was able to understand the nature and purpose of the proceedings and to assist counsel in his defense. Specifically, when defendant was asked if he knew what a jury trial was, he explained: "Where you have twelve people plus two deciding your case. If one of them get sick, the other two substitute." As the State contends, this colloquy demonstrates that defendant understood the role of the jury and the purpose of selecting alternate jurors.

The only evidence defendant now asserts raised a *bona fide* doubt as to his fitness is that he twice attempted suicide. The State challenges the veracity of the unsubstantiated suicide reports, but maintains that even if the reports are true, unsuccessful attempts at suicide do not in themselves indicate unfitness and suggests that suicidal behavior could just as likely occur in someone depressed, but completely fit. Defendant counters that attempted suicide can be a symptom of a variety of mental illnesses which in turn could impair a defendant's ability to understand proceedings and assist counsel. Significantly, defendant offers no examples of his inability to understand the proceedings, nor does he claim he suffers from a mental illness. Standing alone, defendant's claimed suicide attempts are insufficient to raise a *bona fide* doubt of his fitness. Defendant offers no supporting evidence and none is contained in the record. Consequently, defendant's claim fails.

In the alternative, defendant argues that his counsel was constitutionally ineffective for failing to raise the issue of his fitness. Ineffective assistance of counsel requires a defendant to show that (1)

defense counsel's performance was deficient by identifying specific acts or omissions of counsel that, in the light of all the circumstances, were outside the range of professionally competent counsel; and (2) but for defense counsel's deficient performance, the outcome would have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 687-94, 80 L. Ed. 2d 674, 693-98, 104 S. Ct. 2052, 2064-68.) Defendant must overcome the strong presumption that counsel's representation was constitutionally adequate. (*People v. Barrow* (1989), 133 Ill. 2d 226, 247, 549 N.E.2d 240.) Counsel cannot be found ineffective for failing to make meritless motions. (*United States v. Madewell* (7th Cir. 1990), 917 F.2d 301, 304.) Both prongs of *Strickland* turn on whether there was a *bona fide* doubt of defendant's fitness. As the foregoing discussion indicates, there was not.

## IV

Defendant claims he was denied a fair trial because the prosecutor improperly argued facts not in evidence and misstated the law during closing argument.

A prosecutor's argument must be based on the evidence or reasonable inferences drawn from the evidence. (*People v. Henderson* (1990), 142 Ill. 2d 258, 324-25, 568 N.E.2d 1234.) A prosecutor may not misstate the applicable law. The prosecution is allowed great latitude in closing argument; improper comments generally do not constitute reversible error unless they result in substantial prejudice to the accused. (*People v. Shum* (1987), 117 Ill. 2d 317, 341, 512 N.E.2d 1183.) The scope of closing argument is to be controlled by the circuit court, and absent a clear abuse of discretion, its rulings will not be overturned. *People v. Simms* (1988), 121 Ill. 2d 259, 269, 520 N.E.2d 308.

## A

Defendant initially challenges the emphasized portion of the following comment:

> "When he points at a person and his partner in crime fires his weapon five times at that person, striking that person's body, when he points out the target, when *he points that finger and says, this is the person that I targeted for those bullets.*" (Emphasis added.)

Defendant objected on the basis that he never said "this is the person that I targeted for those bullets." The court responded, "Jury has heard the evidence, proceed."

Both parties agree that defendant said nothing when he pointed at the victim. Defendant argues the State was suggesting that he did. The State counters the prosecutor never alleged that defendant said

anything; rather, the prosecutor merely was drawing a reasonable inference from defendant's act of pointing at the fleeing victim.

■ A review of the record and the challenged comment reveals that the prosecutor was referring to defendant's act of pointing, and was not insinuating that defendant actually said those words. Consequently, defendant's argument fails.

### B

Defendant also takes issue with the prosecutor's remark that the victim's statement to his sister should be believed because "that guy is laying [*sic*] there breathing his last breath." Upon defendant's objection, the circuit court noted that the jury had heard the evidence. Defendant contends there was no evidence that the victim was taking his last breath, as he did not die until two days later. The jury was apprised of the fact that the victim survived for two days after the shooting and would well have understood the prosecutor's remark to have been a figure of speech. There was no reversible prejudice that could have been attributed to the prosecutor's statement, and the comment could not have changed the result of the trial. See *People v. Jenkins* (1991), 209 Ill. App. 3d 249, 257, 568 N.E.2d 122.

### C

Defendant urges the State further misstated the evidence when it twice argued that he opened the trunk of Owens' car. No objection was made at trial to either statement. The State correctly notes that defendant himself said that he opened the trunk in his written statement to police. When asked by the assistant State's Attorney, "What did *you* do once you got to the car?" (emphasis added), he answered, "Opened the trunk." Later in his written statement defendant said that Owens opened the trunk. The State insists that it was entitled to argue the first version of defendant's story to the jury. We agree.

### D

Defendant next avers the prosecutor misstated the evidence by asserting that defendant's own mother would not let him enter her house.

The relevant comment, made during rebuttal argument over defendant's running objection, is as follows:

> "Please look at [defendant's] statement carefully ***. *** [L]ook at page 4 ***. Page 5. *** Page 6. ***
>
> * * *
>
> Page—'why did you go there? To talk to my mother first before I do anything.' This guy was planning and he was thinking and he

was going there to commit an offense. Page 9. 'Why did she say you can't come in the house? Like, that she knew what I was going to do, she knew I was going to fight."

The parties agree the evidence showed that defendant went to his mother's house, but she was not at home. He next went to a neighbor's house where a woman told him he could not enter. The record reveals that the quotation about attempting to see defendant's mother appeared on page 8 of his statement and the quotation concerning the neighbor's refusal to let him in appears on page 9. It is clear that the prosecutor was moving page by page through defendant's written statement, jumping from point to point. The jury understood this from having heard the evidence presented at trial. Defendant misapprehends the prosecutor's remark.

Defendant's argument that the State misstated the evidence is without merit.

## E

Defendant alleges the State repeatedly misstated the law of accountability. Specifically, he complains the State improperly argued that "hitting, fighting, or threatening" was an offense that constituted "an offense" under the accountability statute. A note sent by the jury to the court concerning accountability evidenced their confusion, according to defendant.

The challenged comments, which were made during rebuttal argument over defendant's running objection, follow:

"You don't have to go out to plan to commit a shooting, it's enough that you plan to commit an offense. Fighting beating up a guy.

\* \* \*

You read the instruction, the Judge will instruct you and you look at those last two words. Any offense, fighting, hitting, threatening, [are] the example[s] that I can think of.

\* \* \*

Well, [defendant] was going over there to fight, [defendant] knew [he] was going to end up fighting. Accountability.

\* \* \*

Page 7, 'and did he know that he was asking [Owens] permission to fight with these guys? Yep. Accountability."

The State responds that the prosecutor correctly stated the law. Moreover, its rebuttal argument "focused on pointing out to the jury all the various facts from which they could draw the conclusion that defendant was not merely a bystander, but a full and complete participant in the events that led up to the shooting of the victim." In addition to defendant's claim that fighting is not an offense, the State correctly counters it is not required to argue to the jury strictly in

legal terms and, therefore, was not required to point out that defendant intended to commit a form of assault or battery. Finally, the jury note reflected the jury's accurate understanding of the law of accountability. There was no reversible error here.

## F

Defendant lastly asserts that the cumulative effect of any improper comments requires reversal. Few of the points relied upon by defendant constituted error. Consequently, no cumulative error resulted that would justify a new trial. See *People v. Albanese* (1984), 104 Ill. 2d 504, 524, 473 N.E.2d 1246.

## V

Defendant maintains his sentence of 35 years' imprisonment is excessive, complaining that the court ignored his rehabilitative potential, his youth, his minimal criminal history, and that he was not the shooter. He further objects to receiving the same sentence as Green, because Green performed the murder while he was merely accountable.

Reviewing courts give great weight to the judgment of the circuit court in evaluating the appropriateness of punishment; a sentence will not be altered absent an abuse of discretion. (*People v. Santiago* (1987), 161 Ill. App. 3d 634, 643, 515 N.E.2d 228.) The circuit court is in the best position to determine a sentence based upon the myriad of factors involved. *People v. Bishop* (1989), 179 Ill. App. 3d 99, 103, 534 N.E.2d 401.

■ In the case at bar, the presentence investigation report indicated that defendant was 22 years of age; was well acquainted with the criminal justice system, having been convicted twice, having a background of indictments, and at least two pending charges; never graduated high school; and had no significant work history. After arguments in aggravation and mitigation, the court observed:

> "And we might also state that *** without you, this doesn't happen. We are fully and readily aware of the fact that you didn't pull the trigger but in essence, you might as well have. You are and were *** the director of this incident. ***
>
> Considering the facts of this case, considering your history, prior delinquency, considering the fact that we feel the sentence is necessary as a deterrent, we sentence you on this case to a period of 35 years Illinois Department of Corrections."

Defendant's sentence was well within the range of punishment prescribed by statute. (See Ill. Rev. Stat. 1991, ch. 38, par. 1005—8—1(a)(1) (now 730 ILCS 5/5—8—1(a)(1) (West 1992)) (20 to 60 years).) The record indicates that the circuit court was aware of and

considered each of the circumstances now argued by defendant as justification for a decreased sentence. In addition, defendant's contention that he should have received a lesser sentence than Green is meritless given the court's findings that he was the "director" of the murder and that it would not have occurred without him. Consequently, defendant's sentence must be affirmed.

For the reasons set forth above, there are no bases in this case upon which to disturb either the conviction or sentence. Accordingly, we affirm both.

Affirmed.

SCARIANO and McCORMICK, JJ., concur.