24 November 1999

No.  2--98--0333 

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF     ) Appeal from the Circuit Court

ILLINOIS,                      ) of Stephenson County.

                               )

Plaintiff-Appellee,      )

                               ) Nos. 97--CF--82

v.                             ) 97--CF--84

                               ) 

FREDERICK A. DAMICO,           ) Honorable

                               ) Charles R. Hartman,

Defendant-Appellant.     ) Presiding, Judge.

JUSTICE GALASSO delivered the opinion of the court:

Following a jury trial, the defendant, Frederick Damico, was found guilty of the offenses of aggravated battery (720 ILCS 5/12--4(a) (West 1996)), for which he was sentenced to 5 years in the Department of Corrections; home invasion 
(720 ILCS 5/12--11 (West 1996)), for which he was sentenced to serve 30 years in the Department of Corrections; and aggravated arson (720 ILCS 5/20--1.1 (West 1996)) for which he was sentenced to serve 25 years in the Department of Corrections.  The sentences imposed on the defendant for aggravated battery and home invasion were ordered to be served consecutively.  The defendant appeals.

On appeal, the defendant raises the following issues: (1) whether the trial court erred in refusing to conduct a pretrial fitness hearing; (2) whether the trial court erred in excluding testimony of a codefendant’s statement as a sanction for the defendant’s failure to comply with discovery; (3) whether the trial court erred in limiting the defendant’s presentation of evidence that a person other than the defendant may have committed the crimes charged; (4) whether the entry of judgment and sentence on the aggravated battery charge violates the one-act-one-crime rule; and (5) whether the sentencing order must be modified to include day-for-day good conduct credit.

Given the nature of the issues raised, we need not set forth the trial testimony at length.  According to the testimony at trial, Scott Worley, the victim, identified the defendant as the man who attacked him in the early morning hours of February 18, 1997, inflicting serious injuries on him.  The victim identified the defendant as his attacker, although he did not know the defendant prior to the attack.  A fire was also started in the victim’s house.  Several witnesses testified that the defendant had been recruited to retaliate against the victim for an alleged theft by the victim of a cell phone and a radar detector.  According to Shawn Hille’s testimony, he accompanied the defendant to the victim’s home.  He observed the defendant kick in the front door and turn on a flashlight.  Hille did not go inside the house but saw the flashlight moving around.  He heard the defendant say "What’s up now, m-----f-----?"  Hille then heard some sounds of wrestling around and sounds as if someone were beating someone.  He then heard a sound like a skull crack.  Jason Canas, another witness, testified that he was present when the defendant struck the victim on the head with an ax, four or five times.  Halle’s and Canas’s testimony also indicated that the defendant was responsible for setting fire to the victim’s house.  Both Hille and Canas had been charged in connection with the attack on the victim.  Hille testified without an agreement with the State.  Canas agreed to testify truthfully about the incident in exchange for not receiving any jail or prison time for his participation in these offenses.

The defendant presented an alibi defense through the testimony of Dolly Stewart
 and  Anastasia Smith (Stacy), his former girlfriend.  None of the tests on the physical evidence recovered in this case connected the defendant to the offenses in this case, nor was the weapon used in this case ever recovered.  The defendant did not testify.

Any additional necessary facts will be set forth in connection with the issue to which they pertain.

The defendant contends, first, that the trial court erred in refusing to conduct a hearing to determine if the defendant was fit to stand trial on these charges.  The defendant does not argue that he was unfit to stand trial but, rather, that the facts and circumstances surrounding his psychological health prior to the start of the trial, compounded by his recent use of Luvox, a medication, raised a 
bona
 
fide
 doubt as to his fitness.  As a result, the trial court was required to hold a fitness hearing.

Prior to trial on the charges in this case, the defendant was arrested on unrelated charges.  On October 16, 1997, after a preliminary hearing on the unrelated charges, the defendant was held in direct criminal contempt of court following an outburst in which he accused the trial judge and the prosecutor of conspiring to keep him incarcerated.  At a pretrial status hearing held on October 24, 1997, in connection with the offenses in the present case, the defendant apologized for his "rude" behavior.  He stated to the trial judge that he had had a great deal of stress as of late and that he had just been placed on medication for his behavior.  The defendant further stated that he felt he needed more time on the medication as he had only been on it for a few days and that the medication was "dragging [him] down."  He was not sure he wished to continue with his present counsel.  Defense counsel explained to the trial judge that the defendant was taking Luvox, which had recently been approved for use in the United States and which was used to treat obsessive compulsive disorder.  The trial judge advised defense counsel that, if he felt that the defendant was not able to cooperate or assist in his own defense, defense counsel should file the appropriate motion.  The trial court then stated as follows:

"Well, there is nothing this court observes.  Mr. Damico is much calmer day [
sic
], but I didn’t find probable cause and yank his bond today, so I can understand him being a little more aggravated last week when I found probable cause against him and threw him into custody.  So it is a different setting. He is quiet, subdued, and his affect is appropriate for the occasion."

The trial in this case commenced on October 27, 1997.  Prior to the start of the trial, defense counsel filed a petition to have the defendant examined to determine if he was fit to stand trial.  The petition alleged that on October 21, 1997, the defendant was diagnosed by Dr. Modir of the Jane Addams Mental Health facility as suffering from obsessive compulsive syndrome, for which he was prescribed the drug Luvox.  The petition further alleged that the medication had altered the defendant’s demeanor, causing him to be drowsy and affecting his recall and that, as a result, a 
bona
 
fide
 doubt existed as to the defendant’s fitness to stand trial. The petition further alleged that, based upon defense counsel’s observations of the defendant’s lack of ability to recollect and recall occurrences relating to the charges pending against him and observations as to his behavior, the defendant was not able to meaningfully assist in his defense.

The trial judge noted that Luvox did not appear to be a psychotropic drug, but a drug for the treatment of depression.  None of the listed side effects appeared to relate to any cognitive impairment.  When the trial court asked for other symptoms indicating that the defendant was unfit to stand trial, defense counsel stated as follows:

"Well, I believe that the most significant indication was as I attempted to prepare for today’s beginning of the trial and discussing his case with him, with the defendant, he was unable often to provide me with information or new information or confirmation of facts that he had provided with me [
sic
] on previous occasions.  He was unable to follow certain lines of thought as we attempted to put together defenses.  That would be my main concern.  That at the present time I don’t feel that he is able to help me, assist me as we go through the trial, as witnesses are called, as testimony and as evidence is presented under his present condition which the court noticed Friday, I believe and it appears the same to day [
sic
], he is at times inaudible in his speech, and often times seems to be off in space somewhere.  That would be my biggest problem is that I don’t believe at this point he is able to assist me as the trial proceeds."

After discussing the dosage of the medication being administered to the defendant, defense counsel concluded as follows:

"Certainly the demeanor of the defendant has changed considerably.  The combativeness that was present in a court hearing at which I wasn’t in attendance but what is on the record in which this court held the defendant in contempt certainly is not present.  Now, in some cases I guess that would be good.  However, in this case it appears to me that there is a lack of interest or inability to concentrate on the issues at hand, and that is basically why I filed the petition."

Defense counsel offered to produce a witness, who was familiar with the defendant, to testify.

The trial court denied the petition.  The court noted that the obsessive compulsive disorder diagnosis did not, in and of itself, indicate that the defendant could not cooperate with defense counsel or was not otherwise fit to stand trial.  The court also noted that the defendant had been examined by a psychiatrist a week prior to trial but nothing else requiring treatment was found.  Finally, the court noted that lapses of memory could be a product of a variety of things, 
e.g.
, if the defendant had made up stories originally to give to defense counsel, he might have trouble remembering them.

In Illinois, a defendant is presumed fit to stand trial and will be considered unfit only if, because of the defendant’s mental or physical condition, the defendant is unable to understand the nature and purpose of the proceedings against him or her or to assist in his or her defense.  
People v. Griffin
, 178 Ill. 2d 65, 79 (1997).  Because of the fundamental constitutional nature of the fitness requirement, once facts
 are brought to the attention of the trial court, either from observation of the defendant or the suggestion of counsel, that raise a 
bona
 
fide
 doubt of the defendant’s fitness to stand trial
, the trial court has a duty to hold a fitness hearing.  
People v. Brandon
, 162 Ill. 2d 450, 456 (1994); see 725 ILCS 5/104--11(a) (West 1996).  Whether a 
bona
 
fide
 doubt as to a defendant’s fitness has arisen is generally a matter within the discretion of the trial court.  
People v. Sandham
, 174 Ill. 2d 379, 382 (1996).

Relevant factors that a trial court may consider in assessing whether a 
bona
 
fide
 doubt of fitness exists include a defendant’s " 'irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial.' " 
People v. Eddmonds
, 143 Ill. 2d 501, 518 (1991), quoting 
Drope v. Missouri
, 420 U.S. 162, 180, 43 L. Ed. 2d 103, 118, 95 S. Ct. 896, 908
 (1975)
.  It is undisputed, however, that there are " 'no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated.' "  
Eddmonds
, 143 Ill. 2d at 518, quoting 
Drope
, 420 U.S. at 180, 43 L. Ed. 2d at 118
, 95 S. Ct. at 908.  Some doubt of a defendant’s fitness is not enough.  
People v. Walker
, 262 Ill. App. 3d 796, 803 (1994).

In addition to the allegations contained in the pretrial petition for a fitness hearing, the defendant points to the information concerning his mental and emotional health contained in his presentence report.  According to the defendant, he has been in and out of psychiatric institutions since he was a child.  At age 13, he was hospitalized for suicide attempts, depression, and family problems for a period of about four months.  Later he spent time in Wilson Center, a place for troubled youths located in Minnesota.  He was hospitalized in Chicago for the same problems in 1988.  The file notes from Dr. Modir, who saw the defendant just prior to the trial in this case, indicated that the defendant could be suffering from posttraumatic stress syndrome, multiple substance abuse, and intermittent explosive disorder and could have a borderline personality disorder.  Luvox was prescribed due to the defendant’s nightmares and to help him with stress during the day.

The defendant points out that, according to the Physicians’ Desk Reference, Luvox is a psychotropic medication.  See Physicians’ Desk Reference (1998 ed.) at 2891-94 (hereinafter PDR).  He concedes that he is not entitled to a presumption of unfitness solely by virtue of his use of psychotropic medication.  See 725 ILCS 5/104--21(a) (1996).  However, he argues that, given his history of depression, the dose of Luvox (100 milligrams per day although the recommended beginning dosage is 50 milligrams per day) he was taking may have caused side effects that harmed his ability to assist in his defense.

A defendant may be competent to participate at trial even though his mind is otherwise unsound.  
Eddmonds
, 143 Ill. 2d at 519.  Fitness speaks only to a person’s ability to function within the context of a trial; it does not refer to competence in other areas.  
Eddmonds
, 143 Ill. 2d at 519-20
.  No single factor in itself raises a 
bona
 
fide
 doubt of a defendant’s fitness to stand trial; the fact that a defendant suffers a mental disturbance or requires psychiatric treatment does not necessarily raise a 
bona
 
fide
 doubt.  
Walker
, 262 Ill. App. 3d at 803.  Even evidence of extreme disruptive behavior and a sociopathic personality does not compel the conclusion that a 
bona
 
fide
 doubt exists as to a defendant’s fitness to stand trial.  
People v. Smith
, 253 Ill. App. 3d 948, 953 (1993).

The defendant argues that an evaluation of the medication and its possible side effects should have been presented to the trial court.  He points out that, according to the PDR, premarketing studies of Luvox involving primarily depressed patients showed that approximately 1% developed hypomania or mania and that the medication could produce impaired cognitive and motor performance.  However, a review of the PDR indicates that the warning to patients necessitated by such potential impairment concerns the operation of heavy machinery, including automobiles, as opposed to normal thought processes.  See PDR at 2892.

At the time the petition for fitness was presented, the trial court and defense counsel discussed the potential side effects of Luvox, which included nausea, drowsiness, general weakness, headache, dry mouth, insomnia, and dizziness.  Other than his comment at an earlier proceeding that the medication was dragging him down, there was no indication that the defendant was suffering from these side effects or that they were preventing him from cooperating with defense counsel.

Moreover, as the trial court noted, the defendant was examined by Dr. Modir shortly before trial in this case.  It was Dr. Modir who prescribed Luvox for the defendant.  While the doctor’s notes reflect that the defendant had certain mental problems, there was nothing in the notes that indicated that Dr. Modir questioned the defendant’s fitness to stand trial or that the medication he prescribed for the defendant would interfere with his fitness to stand trial.

Based upon the record in this case, we conclude that the trial court did not abuse its discretion in determining that the defendant did not raise a 
bona
 
fide
 doubt as to his fitness to stand trial and, therefore, no fitness hearing was required.

Next, the defendant contends that the trial judge erred when he struck evidence of a codefendant’s confession as a sanction for a discovery violation.

Dolly Stewart, who was 16 years of age at the time of the offenses in this case, testified that she lived with the defendant and Stacy, the defendant’s girlfriend, at their apartment.  On the night of February 17, 1997, the defendant, Stacy, and she were at the apartment
 celebrating the defendant and Stacy’s two-year anniversary.  According to Dolly, the defendant was present in the apartment all evening except for around 3 a.m., when he left the apartment for around 10 minutes.

Dolly further testified that on either August 30 or 31, 1997, she was at a gas station with a group of people that included Shawn Hille.  At that time she had a conversation with Hille in which he told her that he had "axed" the victim "and that he was going to have to do it to [the defendant] too."  On cross-

examination, Dolly testified that she did not tell the police about what Hille had said and had only the previous Sunday told defense counsel about the statement.  She also testified that defense counsel took notes of her statement.

In his own testimony in this case, Shawn Hille denied telling anyone he had "axed" the victim.

Outside the presence of the jury, the prosecutor advised the trial court that he had not been furnished with a copy of defense counsel’s summary of Dolly’s statement and requested that her testimony as to Hille’s stating that he had "axed" the victim be stricken.  Defense counsel argued that Dolly had been on the list of witnesses furnished to the State but that neither the State nor the police had ever chosen to interview her.  As an alternative to striking her testimony, defense counsel suggested that the prosecutor be allowed
 
the opportunity to interview Dolly.  The trial court acknowledged that the State should have interviewed Dolly prior to trial but concluded that, since Dolly had already testified, a delay of the proceedings was not appropriate.  The trial court concluded that the exclusion of the testimony was required by the supreme court rules regarding discovery disclosures.  The trial court then instructed the jury that they were to disregard Dolly’s testimony that Hille had told her that he had "axed" the victim.

Supreme Court Rule 413(d) provides in pertinent part as follows:

"Subject to constitutional limitations and within a reasonable time after the filing of a written motion by the State, defense counsel *** shall furnish the State with the following material and information within his possession or control:

(i) the names and last known addresses of persons he intends to call as witnesses, together with their relevant written or recorded statements, including memoranda reporting or summarizing their oral statements ***."  134 Ill. 2d R. 413(d).

Upon learning of a party’s failure to comply with an applicable discovery rule, the circuit court 
" 'may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, exclude such evidence, or enter such order as it deems just under the circumstances.' "  
People v. Johnson
, 262 Ill. App. 3d 781, 788 (1994), quoting 134 Ill. 2d R. 415(g)(i).  The correct sanction to be applied is left to the trial court’s discretion, and the trial court’s judgment is given great weight.  
People v. Levin
, 207 Ill. App. 3d 923, 933 (1991).  Sanctions imposed for discovery violations should be fashioned to meet the circumstances of the particular case with the ultimate objective of compelling compliance, not punishing a party for the oversight or the errors of his attorney.  
Levin
, 207 Ill. App. 3d at 933.  In Illinois, the sanction of preclusion is limited to only the most extreme cases of discovery violations.  
Levin
, 207 Ill. App. 3d at 933.  When the exclusion of evidence is employed by the trial court, that decision will be closely scrutinized on appeal.  
People v. White
, 257 Ill. App. 3d 405, 414 (1993).  The exclusion of evidence must not encroach upon the defendant’s right to a fair trial.  
White
, 257 Ill. App. 3d at 414.

Though a trial court may impose sanctions for the failure to comply with discovery rules, courts cannot ignore the fundamental character of a defendant’s right under the compulsory process clause of the sixth amendment (U.S. Const., amend. VI) to offer testimony of witnesses in his favor.  
Levin
, 207 Ill. App. 3d at 933; 
Taylor v. Illinois
, 484 U.S. 400, 414, 98 L. Ed. 2d 798, 814, 108 S. Ct. 646, 655 (1988).  Where a party’s explanation for its failure to disclose a witness (or as in this case a witness’s statement) reveals that the omission was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence, it would be entirely consistent with the purposes of the compulsory process clause to exclude the witness’s testimony.  
Levin
, 207 Ill. App. 3d at 933; 
Taylor
, 484 U.S. at 415, 98 L. Ed. 2d at 814, 108 S. Ct. at 655-

56.  Regardless of whether the discovery violation caused prejudice to the prosecution, willful and blatant violations merit the most severe sanctions.  
Levin
, 207 Ill. App. 3d at 933-34; 
Taylor
, 484 U.S. at 416-17, 98 L. Ed. 2d at 815, 108 S. Ct. at 656.

In this case, defense counsel offered no explanation for his failure to turn over his summary of Dolly’s statement.  However, as Dolly herself confirmed, she first told defense counsel
 of Hille’s statement only a few days before the defendant’s trial commenced.  Dolly was listed as a defense witness, yet the State never chose to interview her prior to trial.  See 
People v. Shriner
, 198 Ill. App. 3d 748, 754 (1990).  The trial court placed emphasis on the fact that, as Dolly had already testified, a delay would not cure the failure to disclose the statement.  However, the prosecutor did not object to her testimony as to Hille’s statement on any basis other than the failure to disclose it; had the statement been disclosed prior to trial, the prosecutor would have been prepared to cross-examine her on it.  Granting a delay for the prosecutor to question Dolly would have permitted the prosecutor to prepare to cross-examine her about the circumstances of Hille’s statement to her.  Moreover, Shawn Hille, the State's own witness, had already testified and denied making any such statement to anyone.

The trial court here made no finding that the defense counsel willfully or blatantly failed to turn over the summary of Dolly’s statement to the State.  There is no evidence that defense counsel withheld Dolly’s statement intentionally to gain some tactical advantage or to disrupt the proceedings.  
People v. Shriner
, 198 Ill. App. 3d 748, 753 (1990).  While we agree with the trial court that the supreme court rules are not merely suggestions but are in fact rules to be followed, under the circumstances in this case, including the fact that Dolly was listed as a witness in the case but the State chose not to interview her and that Hille testified that he did not make such a statement to anyone, we conclude that the trial court abused its discretion in excluding Dolly’s testimony as to Hille’s statement to her, rather than imposing a lesser sanction on the defendant that would have cured any prejudice to the State.

We now must determine if the error was harmless.  The error here involves the defendant’s federal constitutional right to present witnesses on his behalf, and before a federal constitutional error can be held harmless, a reviewing court must be satisfied beyond a reasonable doubt that the error did not contribute to the defendant’s conviction.  
Levin
, 207 Ill. App. 3d at 934.  In order to find the error harmless, we must find beyond a reasonable doubt that the jury’s verdict would not have been different had the jury been allowed to consider Dolly’s testimony that Hille told her he had "axed" the victim.

The issue is one of credibility.  In finding the defendant guilty of the offenses in this case, the jury chose not to believe Dolly’s alibi testimony on the defendant’s behalf.  There is no reasonable basis for assuming that the jury, having rejected her alibi testimony would, however, choose to believe her testimony that Hille, rather than the defendant, attacked the victim.  Even if it could be argued that Dolly's credibility had been damaged in the eyes of the jury because the trial court struck the portion of her testimony relating to Hille's statement, Stacy Smith provided the same alibi for the defendant in her testimony.

Moreover, the victim in this case identified the defendant as his attacker, and the defendant does not argue that his identification was flawed in any way.  In addition to the testimony of Hille and Canas, the State also presented the testimony of Betty Jo Busker and Nicole Tipton, both of whom testified to the circumstances surrounding the recruitment of the defendant to "scare" the victim because the victim had allegedly stolen items from Jason Schultz, a friend of theirs.  Betty Jo described the defendant as wearing black clothing that night;  the victim had described his attacker similarly.  Both women testified to driving over to the victim's house with the defendant, Hille, and Canas.  Neither woman went inside the victim's home, nor did they see where the defendant went.  However, according to Nicole, when the defendant returned to the car, he was carrying an ax.

Given the evidence of the defendant’s guilt in this case, we conclude that the error in excluding the testimony of the defendant’s witness, Dolly Stewart, as to the statement to her by Shawn Hille was harmless beyond a reasonable doubt.  We therefore need not address the defendant's alternative argument that defense counsel's failure to meet his discovery obligation rose to the level of ineffectiveness of counsel.

Next, the defendant contends that the trial court erred when it limited the testimony of one of the defense witnesses.

James Steele, who lived in the apartment above the victim, testified that Curtis Christian, also known as "Rooster," lived in a building straight across from the backyard of the building that Steele and the victim lived in.  Steele would see Rooster in the victim’s apartment on "payday," which was toward the end of the month when the victim received his social security check.  Rooster would usually show up on Saturdays.  According to Steele, he saw Rooster in the victim’s apartment on the Saturday of the first weekend of February 1997.  Rooster was carrying a hickory stick that he usually brought with him for these end-of-the-month visits.

Following an objection by the prosecutor, defense counsel made an offer of proof.  According to the offer of proof, Steele would testify that, at the beginning of February 1997, Rooster threatened to bash in the victim’s head with the hickory stick.  Mr. Steele would further testify that, on the night of the attack on the victim, he observed the lights in Rooster’s apartment go out immediately upon the arrival of the emergency personnel and that the next day, when he was in Rooster’s apartment, he noticed that the hickory stick, which was always kept in the kitchen, was no longer there.  The trial court allowed Steele to testify as to Rooster’s threat against the victim, but not as to the lights going out or the missing hickory stick.

Steele subsequently testified that Rooster threatened to use his stick on the victim if he did not pay him the money he owed him for drugs.  On cross-

examination, Steele testified that the victim would pay Rooster at the beginning and at the middle of each month.

A defendant may attempt to prove that someone else committed the crime with which he is charged; however, this right is not without limitations.  
People v. Lewis
, 165 Ill. 2d 305, 341 (1995). Generally, the test for admissibility of evidence is whether such evidence tends to prove the particular offense charged.  
Lewis
, 165 Ill. 2d at 341.  Whether what is offered as evidence will be admitted or excluded depends upon whether it tends to make the question of guilt more or less probable.  
Lewis
, 165 Ill. 2d at 341-42.  Where the offered evidence is uncertain or speculative, the trial court in its discretion may properly reject it.  
Lewis
, 165 Ill. 2d at 342.  A trial court's determination of whether evidence is relevant and admissible will not be reversed absent a clear abuse of discretion resulting in manifest prejudice to the defendant.  
People v. Pursley
, 284 Ill. App. 3d 597, 603 (1996).

We agree with the trial court that the evidence concerning the timing of the lights going out in Rooster’s apartment was too speculative to be admissible.  As the trial court pointed out, there could be any number of innocent explanations as to why the lights went out.  Other than the defendant’s speculation, there is nothing in the evidence that connects the lights in Rooster’s apartment going out to the offenses in this case or that makes it more probable that it was Rooster who attacked the victim in this case.

We also agree with the trial court that the fact that the hickory stick was not in its usual place in Rooster’s kitchen did not indicate that the stick was missing as opposed to merely being in another part of Rooster’s apartment.  The relevancy of the fact that the hickory stick was not in its usual place depends upon whether the hickory stick was in fact missing, which was not shown by the evidence.  See 
People v. Newbury
, 53 Ill. 2d 228, 240 (1972) (torn photograph found in the deceased’s bedroom should have been excluded where its relevance depended upon unproved assumptions--that it had been torn recently and deliberately and by the deceased).

Therefore, we conclude that the trial court did not err in excluding those portions of James Steele’s testimony relating to observing the lights go off in Rooster’s apartment and the absence of the hickory stick from Rooster’s kitchen after the offenses in this case were committed.

Next, the defendant contends that, since his convictions of the offenses of home invasion and aggravated battery are based upon the same conduct, his conviction of aggravated battery must be vacated as violative of the one-act-one-

crime rule.

In 
People v. King
, 66 Ill. 2d 551 (1977), our supreme court stated as follows:

"Prejudice results to the defendant only in those instances where more than one offense is carved from the same physical act.  Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one offense, some of which are, by definition, lesser included offenses. Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts.  'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense.  We hold, therefore, that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered."  
King
, 66 Ill. 2d at 566.

In 
People v. Rodriguez
, 169 Ill. 2d 183, 187 (1996), the supreme court subsequently held that the 
King
 doctrine likewise applies to cases in which consecutive sentences are imposed.

The information in this case charged that the defendant committed the offense of aggravated battery in that in committing a battery he "intentionally caused great bodily harm to Scott Worley in that he struck Scott Worley in the head with a blunt object, fracturing the skull of Scott Worley."  The information further charged that the defendant committed the offense of home invasion in that he, "not a peace officer acting in the line of duty, knowingly, and without authority, entered the dwelling of Scott Worley, *** knowing Scott Worley to be present within that dwelling and intentionally caused injury to Scott Worley in that he struck Scott Worley in the head with a blunt instrument."

In 
Rodriguez
, the defendant was found guilty of aggravated criminal sexual assault and home invasion based upon his conduct in entering the bedroom of the 13-year-old victim and sexually assaulting her while brandishing a handgun.  
Rodriguez
, 169 Ill. 2d at 185.  The appellate court vacated his home invasion conviction on the basis that the two offenses were based upon the same physical act: threatening the victim with a gun.  
Rodriguez
, 169 Ill. 2d at 187-88.

The supreme court reversed the appellate court decision in part, stating as follows:

"Applying 
King
 to the present case, we conclude that the aggravated criminal sexual assault offense and the home invasion offense were based on separate acts.  Although both offenses shared the common act of defendant threatening the victim with a gun, '[a] person can be guilty of two offenses when a common act is part of both offenses.'  [Citation.] Defendant’s unlawful entry into the victim’s bedroom was an overt or outward manifestation that supported a different offense, 
i.e.
, home invasion.  'As long as there are multiple acts 
as defined in King
, their interrelationship does not preclude multiple convictions ***.'  (Emphasis added.) [Citation.]  Thus, the convictions of both aggravated criminal sexual assault and home invasion are proper where defendant committed multiple acts ***.  [Citation.]"  
Rodriguez
, 169 Ill. 2d at 188-89.

Similarly in the present case, both offenses shared the common act of the defendant striking the victim with a blunt instrument causing him injury.  However, the defendant’s unlawful entry into the victim’s house, 
i.e.
, home invasion, supported his conviction for that offense.  Therefore, the defendant’s convictions of both aggravated battery and home invasion do not violate the 
King
 doctrine.

The defendant relies on 
People v. Monigan
, 204 Ill. App. 3d 686 (1990).  In that case, the appellate court vacated the defendant’s aggravated battery conviction on the basis that it was based upon the same physical act, 
i.e.
, the beating of the victim underlying his home invasion conviction.  
Monigan
, 204 Ill. App. 3d at 690.  In light of the discussion in 
Rodriguez
 concerning the definition of the term "act," we chose not to follow 
Monigan
.

However, we further conclude that, under the facts in this case, aggravated battery is a lesser included offense of home invasion. In 
People v. Novak
, 163 Ill. 2d 93 (1994), our supreme court adopted the "charging instrument approach" to identify a lesser included offense.  This approach looks to the facts alleged in the charging instrument in identifying a lesser included offense. 
Novak
, 163 Ill. 2d at 107.  Under this approach, an offense is deemed to be a lesser included offense if it is described by the charging instrument.  
Novak
, 163 Ill. 2d at 107.

The charging instrument approach does not require the lesser crime to be a theoretically or practically "necessary" part of the greater crime.  
Novak
, 163 Ill. 2d at 107.  Rather, the lesser crime need only relate to the greater to the extent that the charging instrument describes the lesser.  
Novak
, 163 Ill. 2d at 107.  The " 'lesser offense must have a broad foundation in the instrument charging the greater,' or at least 'set out the main outline of the lesser offense.' [Citation.]" 
Novak
, 163 Ill. 2d at 107.

In 
People v. Gorney
, 136 Ill. App. 3d 878 (1985), the defendant was found guilty of aggravated battery and home invasion.  The reviewing court reversed the defendant’s conviction of aggravated battery, holding that the aggravated battery was a lesser included offense of home invasion where the State relied on the defendant’s act in striking the victim in the face in order to support the home invasion charge, as well as causing bodily harm to support the aggravated battery charges.  
Gorney
, 136 Ill. App. 3d at 880.

Likewise, in the present case, the State relied on the defendant’s act of striking the victim with a blunt object causing him injury to support both the home invasion and the aggravated battery charges.

Multiple convictions based upon a single act cannot stand where a defendant is convicted of more than one offense if some are lesser included offenses.  
People v Smith
, 183 Ill. 2d 425, 431-32 (1998).  The defendant’s conviction of and sentence for aggravated battery must be vacated.

Finally, the defendant contends that this cause must be remanded to the trial court for the issuance of a corrected mittimus to reflect the defendant’s eligibility for day-for-day good conduct credit.

The defendant committed the offenses in this case on February 18, 1997.  Therefore, the defendant was subject to the truth-in-sentencing provision of Public Act 89--462,  which took effect on May 29, 1996 (Pub. Act 89--462, eff. May 29, 1996).  The State acknowledges that Public Act 89--404, in which the legislature first enacted the truth-in-sentencing legislation, was held unconstitutional as violative of the single subject rule.  See 
People v. Reedy
, 186 Ill. 2d 1, 11-12 (1999) (modified upon denial of rehearing).  However, the State argues that the truth-in-sentencing provisions of Public Act 89--462 have never been held invalid and that therefore the defendant here was properly sentenced under the provisions of Public Act 89--462.  In the alternative, the State argues that if Public Act 89--462 is unconstitutional, the defendant’s sentence is void, and the cause must be remanded for sentencing.

In 
Reedy
, our supreme court rejected both of the State’s arguments.  The court stated as follows:

"Next, the State contends that, although Public Act 89--404 may have violated the single subject rule, it was not the act under which defendants were sentenced.  The State claims that, instead, Public Act 89-

-462 is the law which applied to defendants’ cases.  The State’s argument is disingenuous at best.  Public Act 89--462 is comprised of a simple amendment adding the offense of predatory sexual assault of a child to the list of offenses to which the truth-in-sentencing law applies.  The State argues that this amendatory language of Public Act 89--462 somehow validated all of the truth-in-sentencing provisions of Public Act 89--404 and, therefore, served as the curative legislation needed to bring the truth-in-sentencing law outside of single subject rule scrutiny.

As the State correctly asserts, the Illinois legislature has the power to enact curative legislation.  [Citations.]  We note, however, that such legislation must exhibit on its face evidence that it is intended to cure or validate defective legislation. *** In the case at bar, however, Public Act 89--462 does not recodify the language of the truth-in-

sentencing provisions of Public Act 89--404.  It only inserts an additional offense to be included in the truth-in-sentencing provision.  Moreover, it is entirely devoid of curative language that would validate any actions taken in reliance upon Public Act 89--404.  We conclude, therefore, that Public Act 89--462 did not serve as curative legislation for any portion of Public Act 89--404."  
Reedy
, 186 Ill. 2d at 14-15.

The above discussion makes it clear that, contrary to the State’s argument,  Public Act 89--462 may not be considered as though Public Act 89--404 never existed.  Rather, in Public Act 89--462, the legislature tried but failed to enact curative legislation for Public Act 89--404.

The supreme court also rejected the State’s argument that the defendant’s sentence is void and that the cause must be remanded for resentencing.  The court found no justification for disturbing any statutorily sound sentence imposed against any defendant under the void truth-in-sentencing law.  
Reedy
, 186 Ill. 2d at 16-18.  As the State does not argue that the defendant did not receive a sentence for home invasion within the statutory guidelines, there is no need to remand this cause for resentencing.

The defendant’s convictions of and sentences for home invasion and aggravated arson are affirmed.  The defendant’s conviction of and sentence for aggravated battery are vacated.
  The judgment is modified to reflect that the defendant is entitled to day-for-day good conduct credit against his sentence for home invasion.

Affirmed in part and vacated in part; modified as to sentence.

INGLIS and McLAREN, JJ., concur.